UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

| | | |
|---|---|---|
| FRANK WARREN ANDERSON, | ) | |
| # 453217, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:08-cv-801 |
| | ) | |
| v. | ) | Honorable Paul L. Maloney |
| | ) | |
| KENNETH ROMANOWSKI, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |
| _____ | ) | |

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner's convictions stem from a series of armed robberies committed in Kalamazoo, Michigan: the robbery at Howard's Party Store on November 13, 2004, the robbery of Alfred Peterson on November 23, 2004, and the robbery at Rich's Gas Station on November 28, 2004.  On March 25, 2005, a Kalamazoo County Circuit Court jury found petitioner guilty of four counts of armed robbery, MICH. COMP. LAWS § 750.529, three counts of felon in possession of a firearm, MICH. COMP. LAWS § 750.224f, and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  On May 2, 2005, Judge William Schma sentenced petitioner as a habitual offender, third felony offense, to 427 months-to-55 years' imprisonment on one of the armed robbery convictions and to 337 months-to-50 years' imprisonment on each of the three remaining armed robbery convictions, and 57 months-to-10 years' imprisonment for each of the felon in possession of a firearm convictions.  These seven sentences are to be served concurrently.  However, they are consecutive to petitioner's two-year sentences on his felony firearm

convictions. After unsuccessful efforts to overturn his convictions in the Michigan courts, petitioner brought this habeas corpus proceeding.

Petitioner claims entitlement to federal habeas corpus relief on the following grounds:

I.  Petitioner was denied his Sixth Amendment rights when counsel rendered ineffective assistance by (1) failing to sever unrelated offenses, (2) failing to challenge unreliable and suggestive identifications, (3)  failing to request a live lineup in the Howard's Party Store robbery, (4) failing to introduce evidence that would have severely damaged the prosecutor's case, and (5) failing to object to improper comments and prejudicial instructions by the trial judge;

II.  Petitioner was denied his "State and Federal constitutional rights to the assistance of counsel at [a] post-arrest corporeal lineup;"

III.  Petitioner was denied his Fourteenth Amendment rights to due process and his Sixth Amendment rights to an impartial jury by the trial judge's prejudicial instructions; and

IV.  Petitioner was denied his "State and Federal Fourteenth Amendment rights to a fair trial due to the structural errors of the trial proceedings."

(Amended Petition, docket # 6, ¶ 14, ID#s 114-18).

Respondent argues that the petition should be dismissed as a mixed petition because grounds III and IV are unexhausted. (docket # 11) (citing *Rose v. Lundy*, 455 U.S. 509 (1982) and 28 U.S.C. § 2254(b)(1)(A)).  Petitioner concedes that grounds III and IV "were not presented [to] the Michigan Courts" and remain unexhausted. (docket # 12, ID# 139).  Petitioner asks the court to address all his claims despite the presence of the unexhausted claims, or alternatively, "delete the unexhausted claims and proceed with the fully exhausted claims." (*Id.* at ID#s 140, 142-43) (citing *Rhines v. Weber*, 544 U.S. 269, 278 (2005)).  However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2); *see Hanna v. Ishee*, 694 F.3d 596, 610

(2012).  Upon review,  I recommend that the petition be denied for lack of merit in all grounds raised.

## Procedural History

### A.    Pretrial Proceedings

On December 2, 2004, petitioner was arrested in Battle Creek, Michigan on an outstanding bench warrant.  He was also placed under arrest for the Howard's Party Store robbery. On December 3, 2004, a live lineup was conducted.  Petitioner was identified as the armed robber by the victim of the pizza delivery robbery (Alfred Peterson) and the victim of the gas station robbery (Essie Lownsbery).  A consolidated felony complaint was filed.  (docket # 2-14, ID#s 86-87). Adversary judicial criminal proceedings commenced on the afternoon of December 3, 2004, when petitioner was arraigned on the ten charges specified in the felony complaint.

On December 15, 2004, petitioner received a preliminary examination in the Eighth District Court for the County of Kalamazoo.  (Preliminary Examination (PE), docket # 15).  Alfred Peterson, Essie Lownsbery, and Marilyn Stover all identified petitioner as the man who had robbed them at gunpoint.  (PE, 12, 26-27, 45).  At the conclusion of proceedings, Judge Carol A. Husum bound over petitioner for trial in Kalamazoo County Circuit Court on all charges.  (PE, 59).

Petitioner's attorney filed a motion to suppress the identifications made on December 3, 2004, on the ground that petitioner had not been represented by counsel during the corporeal lineup.  (docket # 2-15, ID#s 96-98).  On March 18, 2005, Judge Schma conducted a hearing on petitioner's motion.  (Hearing Transcript (HT), docket # 32).  Judge Schma recognized that the

Supreme Court defined the controlling constitutional standard in *Moore v. Illinois*, 434 U.S. 220

(1977):

> "The right to counsel announced in *Wade* and *Gilbert*[1] attaches only to corporeal identifications conducted 'at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment' . . . because the initiation of such proceedings marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable.

(HT, 25-26) (quoting *Moore*, 434 U.S. at 226-27).  Judge Schma quoted from the Michigan Supreme

Court's decision in *People v. Hickman*, 684 N.W.2d 267, 270 (Mich 2004):  "[I]t is now beyond

question that, for federal Sixth Amendment purposes, the right to counsel attaches only at or after

the initiation of adversarial judicial proceedings."  (HT, 26).  He recognized that in  *Hickman*, the

Michigan Supreme Court adopted the federal standard as the state-law standard:

> Because the *Moore* analysis is consistent with both U.S. Const., Am,. VI and Const. 1963, art. 1, § 20, which expressly apply only to criminal prosecutions, we adopt that analysis and hold that the right to counsel attaches only to corporeal identifications conducted at or after the initiation of adversarial judicial criminal proceedings.

*Hickman*, 684 N.W.2d at 271.  Judge Schma found that the identifications challenged by petitioner

had occurred before the initiation of adversary judicial criminal proceedings.  (HT, 27).  Petitioner

had no right to counsel at the time in question.  Judge Schma denied petitioner's motion to suppress.

(HT, 27).

### B.    Trial

      Petitioner's trial began on  March 22, 2005, and concluded with the jury's verdict on

March 25, 2005, finding him guilty on all charges:  four counts of armed robbery, MICH. COMP.

---

[1] *United States v. Wade*, 388 U.S. 218 (1967); *Gilbert v. California*, 388 U.S. 263 (1967).

LAWS § 750.529, three counts of felon in possession of a firearm, MICH. COMP. LAWS § 750.224f,

and three counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS

§ 750.227b.  (Trial Transcripts (TT I-IV), docket #s 33-36).

   During jury selection, Judge Schma attempted to provide potential jurors with a rough

outline of the anticipated length of the trial in order to determine whether jurors would have personal

or professional commitments that would prevent them from focusing on petitioner's trial.  Judge

Schma emphasized that it was impossible to predict exactly how long any trial would last:

> Obviously the length of any jury service is always a big issue for jurors, and we need
> to talk about that.  As we talk about it, please remember what I said at the very beginning;
> and that is that the jury's an important part of this court.  We can't do this without you.  Jury
> service is like voting.  It's part of self-government, and we – we would certainly neglect it
> at our peril.
>
> But, on the other hand, it's understandable that people have personal and private
> matters going on and professional matters going on that–personal and professional issues can
> be pressing and may prevent you from being able to focus on what we're doing here in the
> courtroom.  So if that's true, we need to know that, obviously.  It impacts your life, impacts
> the parties' right to a fair trial; and we understand that.
>
> It's never possible to tell you exactly how long a trial is going to last.  There's a
> number of crimes charged here.  You heard a lot of witnesses' names.  They won't all testify,
> but it's going to take us some time to do this.
>
> Let me tell you what I believe the attorneys agree is a likely schedule, and they're the
> ones that know what the evidence is and how long it's likely to take to present it to you.  But
> they are predicting that if we go for the remainder of today till about 4:00, 4:30; all day
> tomorrow – except for the noon hour; Thursday – and probably Thursday in a compressed
> fashion – with most of the work being done sort of towards the middle of day from 10:30 or
> so until midafternoon because of scheduling conflicts.
>
> We wish to go Friday morning.  Now I know Friday is Good Friday, and that will
> necessarily impact on some people.  I think generally it's in the afternoons, but it may be in
> the morning.  We do at this point wish to conduct the trial Friday morning but not Friday
> afternoon.

The attorneys think that if we apply ourselves fairly disciplined way on those times, that within that time frame we will either get all the evidence in your hands – that is, all the witnesses testifying or almost all of them.  If we have some witnesses left after Friday morning we'll have to come back and continue the case next Tuesday.  We don't have trials on Mondays.  We'd come back next Tuesday.

If we happen to finish Friday and you're deliberating, we would adjourn at noon or thereabouts, and the jury would come back and deliberate Monday. We can deliberate Monday; we can't conduct trials in court because we have other – other matters going on.

So depending on how the evidence goes, the case will be handed to the jury for deliberations sometime probably Friday or Tuesday.  Then, of course, the jury's got – got to deliberate, and we don't put limits on how long juries deliberate.  It can go for some time; it can be short.  We don't know.

(TT I, 46-48).

Judge Schma then invited potential jurors to disclose any scheduling issues or hardships.  (TT I, 48).  During one of these exchanges, a potential juror stated that he might have a scheduling problem if the  trial extended into a third week.  The judge replied that the trial was not likely to take that long.  (TT I, 53).  While the attorneys were at the bench discussing potential removal of jurors for cause, petitioner decided to disrupt the court proceedings and he had to be temporarily removed from the courtroom:

THE COURT:  Okay.  Thanks for bringing that up.  Appreciate that.
        Did somebody else – Number one – juror one?

JUROR 212049:  I have no problem through the end of next week, but April 2nd we have . . . (inaudible)

THE COURT:  Okay.

JUROR 212049:  I don't know how far it may go, but just if deliberation may become the issue.  I've done this before, so I don't know if it'll stretch into four or five days.

THE COURT: Not likely.  I think not likely.  But again thanks for bringing that up.  Okay. Counsel, would you approach the bench, please.

(At 2:57 p.m., bench conference)

THE DEFENDANT:  Ladies and gentlemen of the jury, there's a legal plot going on in this courtroom with my court-appointed attorney and the prosecutor; and I can prove it.  I can give more than enough reasons –

THE COURT:  Mr. Anderson –

THE DEFENDANT:  – for my attorney to be excluded from this case.

THE COURT:  Would you remove Mr. Anderson from the courtroom, please.

THE DEFENDANT:  I can give more than enough reasons for this attorney to be excluded from this case.  But for some reason this judge has not granted my wish to appoint new counsel.

(At 2:59 p.m., defendant removed from courtroom)

(TT I, 53-54).  Outside the presence of the jury, Judge Schma discussed petitioner's outburst with the attorneys.  (TT I, 56-59).  The judge had petitioner brought back into the courtroom outside the presence of the jury.  He informed petitioner that if he continued disrupting the court proceedings he would be removed from the courtroom.  (TT I, 59-60).  When petitioner expressed his intent to continue disrupting the proceedings (TT I, 60-60), Judge Schma elected to adjourn for the day.  Before excusing the jury for the evening, the judge instructed the potential jurors to disregard the incident.  (TT I, 65).  On March 23, 2005, jury selection concluded without further disruption.  (TT II, 148).

Petitioner's accomplices Adrian Travier and Tyrone Gardner-Bey testified against him pursuant to plea agreements.  Travier was petitioner's accomplice in all the robberies.  (TT III, 337).  Gardner-Bey was an accomplice in the robbery at Rich's Gas Station.  All three men were known by street aliases: (1) petitioner was "Frank Nitty" or "Nitty" (TT II, 302; TT III, 476), Adrian Travier was "A.D."  (TT II, 303; TT III, 475), and Gardner-Bey was "Unc." (TT III, 341, 476).

-7-

Petitioner stipulated that in November 2004, he could not legally possess a firearm because he had previously been convicted of a felony.  (TT I, 14; TT III, 474).

### Howard's Party Store

Adrian Travier testified that on the evening of November 14, 2004, he and petitioner went to Howard's Party Store.  Marilyn Stover was the store's night manager.  (TT II, 210, 254). Richard Parce was a store clerk.  (TT II, 210).  Mr. Parce and Ms. Stover saw a man walk into the store from the back parking lot.  The man was attempting to conceal his face with a scarf.  He pulled out a gun and stated that it was a robbery.  (TT II, 210, 230, 254-56).  The gunman was accompanied by a second man, Adrian Travier.  Travier concealed his face with a ski mask.  (TT II, 216, 258, 303-04).

Petitioner walked up to the register and pointed his gun at Mr. Parce.  Petitioner demanded all the money out of the cash register.  (TT II, 217).  When Parce stood still and did not hand over the money, petitioner hit Parce in the face with his gun.  (TT II, 217, 225, 305).  Petitioner then walked across the store and approached Ms. Stover at the Western Union counter.  (TT II, 257, 261).  Ms. Stover told the gunman to take his toy gun and leave.  Petitioner took out his  gun, showed Ms. Stover that it was real, and pointed it at her head.  (TT II, 255, 260-63).  When petitioner demanded Hennessy liquor, Ms. Stover offered no response and just stared at him.  (TT II, 263-64). The scarf petitioner had been using in an attempt to conceal his face kept sliding down.  (TT II, 271). Ms. Stover testified that petitioner was the gunman.  (TT II, 273-74, 281).  Petitioner lifted the gun, threatening to strike Ms Stover with it, but Travier intervened and told petitioner to leave her alone. (TT II, 266, 268; TT III, 305).

While petitioner and Travier were temporarily occupied with Ms. Stover, Richard Parce was able to slip into an adjoining office and dial 911. He did not have an opportunity to speak with the operator, but was able to leave the open connection. (TT II, 220, 234). The 911 audio recording was entered into evidence, and during closing argument, the prosecutor invited the jurors to listen carefully to the recording and they would hear Adrian Travier calling out to petitioner by his street name "Nitty" and telling him not to hit Ms. Stover. (TT II, 233; TT IV, 516).

Petitioner was unable to make any progress with the unflappable Ms. Stover. He went looking for Mr. Parce and found him in the office. Petitioner stated, "I want you to get your ass out here and open up that drawer and give me your money . . . or I'll blow your head off." (TT II, 222). When Parce opened the cash drawer, petitioner reached in and grabbed the cash. (TT II, 223). Petitioner grabbed a carton of Newport cigarettes, tucked them under his arm, and he and Travier fled out the back door. (TT II, 268-70, 274, 282).

Ms. Stover and Mr. Parce gave police descriptions of the two suspects, their clothing, and the gun used during the robbery. (TT II, 174). On December 1, 2004, Parce picked petitioner's photograph out of a photo array. (TT II 244, 251, 288-89).

Pizza Delivery Driver Alfred Peterson

On November 23, 2004, Alfred Peterson was a college student working at his job delivering pizzas. (TT III, 369, 426-29). He became lost in the area of the Riverview Apartments. (TT II, 308). Peterson was turning his car around in the parking lot when petitioner signaled to gain his attention. (TT II, 370; TT III, 431). Adrian Travier was nearby, and when he saw petitioner put his hood up, he knew that petitioner was going to rob Peterson. (TT II, 311-12). Petitioner feigned

that the pizza was for his uncle and that he knew where it should be delivered.  Petitioner walked

towards Peterson and stuck a gun in his stomach.  Petitioner took money and a pizza from Peterson.

(TT III, 433-35).  Petitioner told Peterson to walk around the back of the apartment building and then

keep walking.  (TT III, 435).  Peterson then walked away, leaving his car behind with the keys still

inside it.  (TT II, 314; TT III, 427).  Petitioner took the car keys.  (TT II, 314).  Travier took money

out of Peterson's car.  (TT II, 309-14).  When Peterson returned, he found that the money had been

taken out of his car and the keys were missing.  (TT III, 435-36).  Peterson used his cell phone to

contact the police and his employer to inform them that he had been robbed.  (TT III, 437).

Peterson informed police that the man who had robbed him at gunpoint had a notable

scar on his jaw line.  (TT III, 370, 438).  Petitioner has such a scar.  (TT III, 371-73, 446).  Peterson

identified petitioner at a lineup (TT III, 379, 442, 444), at the preliminary examination, and again at

trial (TT III, 371, 434, 444).  Peterson was "one hundred percent" sure that petitioner was the man

who had robbed him at gunpoint:

Q      You understand sir, that it's important that we do not misidentify anyone?

A.     Yes.

Q      How confident do you feel that the person your pointing out in the courtroom today
       is the person that stuck the gun in your stomach?

A      One hundred percent.

(TT III, 448-49).

<u>Rich's Gas Station</u>

On November 28, 2004, Adrian Travier drove petitioner and Tyrone Gardner-Bey to

Rich's Gas Station.  (TT II, 315; TT III, 475-76).  Travier was driving his "off-gold" 1997 Buick

-10-

LeSabre.  (TT II, 307-08).  He parked behind the gas station.  (TT II, 316).  Petitioner and Travier went inside.  (TT II, 316).  They attempted to conceal their faces in the same manner as they had for the Howard's Party Store robbery.  (TT II, 316).  Gardner-Bey stayed behind with the car.  (TT III, 475).

Essie Lownsbery was working alone at Rich's Gas Station on the night in question. (TT III, 384-85).  She saw the two men enter the store.  The man without a mask had the gun.  The gunman told Ms. Lownsbery to open the cash register and nobody would get hurt.  (TT III, 385, 390). Lownsbery opened up the register.  (TT III, 392).  When she did so, Travier came behind the counter, grabbed the cash, two cartons of Newport cigarettes, two phones (the store's cordless phone and Lownsbery's cell phone) and a case of Black and Mild cigars.  Petitioner and Travier left the store carrying these items.  (TT II, 316, 321, 356-57; TT III, 392-93).  Gardner-Bey testified that the cash and tobacco products were later split at his mother's apartment.  (TT III, 480-83).  Police found unopened packs of Newport cigarettes, an empty Newport carton, and Black and Mild cigars at that location.  (TT III, 493, 495).  On the night of the robbery, the cell phone taken from Ms. Lownsbery had been used to place a call to petitioner's girlfriend, Alicia Todd.  (TT III, 408, 486).  Ms. Lownsbery subsequently picked petitioner out of a lineup.  (TT III, 404-05).  At trial, she identified petitioner as the armed robber.  (TT III, 401-02).

Petitioner, Travier, and Gardner-Bey were unaware that Bernard Lee, a cleaning worker in an adjacent building, noticed the three men and the unusual place they had parked.  He recorded the vehicle's license plate.  He saw two men leave the car and walk towards the store.  One of them flipped up the hood of his sweatshirt over his head just before entering.  The third man remained with the car.  Lee saw two men run out of the store carrying something.  They got back in

the car and the group drove away.  (TT III, 418-26).  Police were able to track down Adrian Travier

through his car's license plate number.  (TT III, 347, 352, 362-63, 500).

      Judge Schma delivered the jury instructions without objections.  (TT IV, 542-66).

After deliberation, the jury returned a verdict finding petitioner guilty of all ten charges.  (TT IV,

567-70).  On May 2, 2005, Judge Schma sentenced petitioner as previously indicated.  (docket # 18,

Sentencing Transcript (ST), 14-16).

### C.    Appeal as of Right to Michigan Court of Appeals

      Petitioner appealed as of right to the Michigan Court of Appeals.  Appellate counsel

raised the following issues:

> I.     IS MR. ANDERSON ENTITLED TO A NEW TRIAL WHERE DEFENSE
> COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE
> BY:  (1) FAILING TO MOVE TO SEVER UNRELATED OFFENSES; (2)
> FAILING TO CHALLENGE UNRELIABLE AND SUGGESTIVE
> IDENTIFICATIONS; (3) FAILING TO REQUEST A LIVE LINEUP IN THE
> HOWARD'S PARTY STORE ROBBERY; AND (4) FAILING TO INTRODUCE
> EVIDENCE THAT WOULD HAVE SEVERELY DAMAGED THE
> PROSECUTION'S CASE?
>
> II.    IS MR. ANDERSON ENTITLED TO A NEW TRIAL WHERE HE WAS DENIED
> HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO THE
> ASSISTANCE OF COUNSEL AT THE POST-ARREST CORPOREAL LINEUP?
>
> III.    IS MR. ANDERSON ENTITLED TO RESENTENCING BECAUSE IMPROPER
> JUDICIAL FACT-FINDING INCREASED HIS AUTHORIZED MAXIMUM
> SENTENCE IN VIOLATION OF HIS RIGHT TO A TRIAL BY JURY?

(Statement of Questions Presented, Defendant-Appellant's Brief at v, Found in docket # 20).

      On December 28, 2006, the Michigan Court of Appeals affirmed petitioner's

convictions and sentence.  (12/28/06 Op., docket # 19).  The Court of Appeals rejected all

petitioner's claims of ineffective assistance of counsel:

-12-

Defendant argues that he was denied the effective assistance of counsel. Our review is limited to mistakes apparent on the record because no evidentiary hearing was held. *People v Rodriguez*, 251 Mich App 10, 38; 650 NW2d 96 (2002). Effective assistance of counsel is presumed, and the defendant has a heavy burden of proving otherwise. *People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001). The attorney's performance must have been "objectively unreasonable in light of prevailing professional norms," and "but for the attorney's error or errors a different outcome reasonably would have resulted." *People v Harmon*, 248 Mich App 522, 531; 640 NW2d 314 (2001). This Court will not second-guess trial strategy with the benefit of hindsight. *People v Davis*, 250 Mich App 357, 368-369; 649 NW2d 94 (2002).

Defendant first asserts that his trial counsel was ineffective for failing to seek to sever the three unrelated criminal offenses. A motion for severance should have been granted if made by counsel. Nevertheless, there has been no showing that, "but for" the errors in failing to move for separate trials, a different outcome would have reasonably resulted. Defendant's two accomplices testified as to his involvement in each case, and there was eyewitness identification for each separate robbery, although some identifications were stronger than others. It is not reasonably likely that defendant would have been acquitted at separate trials. Moreover, counsel's decision to go forward with all three cases in a single trial may have been a matter of trial strategy. Defendant's defense was one of identity. Casting doubt on the accomplices' testimony may have been more effective where there was a string of crimes. The accomplices had more motivation to lie and identify defendant because of the number of crimes at issue. Matters of trial strategy will not be second guessed. *Davis, supra*. Defendant has not sustained his burden of establishing that counsel's decision not to seek severance was objectively unreasonable and prejudicial. *Harmon, supra*.

Defendant next argues that his counsel was ineffective for failing to challenge suggestive, unreliable out-of-court identifications. "[D]ue process protects the accused against the introduction of evidence of, or tainted by, unreliable pretrial identifications obtained through unnecessarily suggestive procedures." *People v Hickman*, 470 Mich 602, 607; 684 NW2d 267 (2004). The fairness of an identification procedure is evaluated in light of the total circumstances, to determine whether the procedure was so impermissibly suggestive that it led to a substantial likelihood of misidentification. *People v Hornsby*, 251 Mich App 462, 466; 650 NW2d 700 (2002).

Here, considering the totality of the circumstances, the challenged photograph and corporeal lineup procedures were not "irreparably unreliable." Defendant contends that the police improperly suggested to one of the witnesses that the guilty party was in the photograph lineup. However, the evidence does not clearly support this assertion. And, more importantly, the witness, to whom the alleged police comments were made, never made an identification from the photographic lineup. There was no tainted identification because an identification was not made. Additionally, the challenged corporeal lineup was not tainted. Before the lineup, a witness was allegedly led to believe that the police's suspect was

included. However, the fact that a witness is told that the perpetrator is in the lineup, standing alone, would not render the lineup unduly suggestive. *People v McElhaney*, 215 Mich App 269, 287; 545 NW2d 18 (1996). The record does not reveal that the lineup was otherwise suggestive in any way. Counsel was not ineffective for failing to challenge the lineup under the circumstances. In reaching our conclusion, we reject defendant's argument that the police likely engaged in other suggestive conduct at both the photographic and corporeal lineups. The argument is based on speculation.

Defendant next claims that his trial counsel rendered ineffective assistance by failing to request a corporeal lineup for witnesses in the Howard's party store robbery. We disagree. "A right to a lineup arises when eyewitness identification has been shown to be a material issue and when there is a reasonable likelihood of mistaken identification that a lineup would tend to resolve." *People v McAllister*, 241 Mich App 466, 471; 616 NW2d 203 (2000). There were two witnesses to the party store robbery. One identified defendant in a photo lineup and one identified defendant at the preliminary examination and at trial. Defendant has not shown that a corporeal lineup would have resolved any mistaken identifications. In fact, there is a substantial possibility the live lineup would have only strengthened the identifications, which were already bolstered by the accomplice testimony. The decision not to request a corporeal lineup constitutes reasonable trial strategy, which we will not second guess. *Davis*, *supra*.

Lastly, defendant asserts that his trial counsel was ineffective at casting doubt on the testimony of the two accomplices. Beyond the witness identifications, the accomplices provided the most damaging evidence against defendant. Defendant believes that if his counsel presented more evidence of their lack of credibility, he may have been acquitted. The record reveals that the credibility of both accomplices was sufficiently brought into question. The jury was made aware that both accomplices had a reason to implicate defendant, and that their testimony lessened their sentences for their own charges. Although defense counsel may have been able to do more to impeach the accomplices, we do not conclude that his conduct fell below an objective standard of reasonableness.

The Court of Appeals found that petitioner did not have a right to counsel at the challenged lineup:

Defendant next argues that he is entitled to a new trial because he was denied his state and federal constitutional rights to the assistance of counsel at post-arrest corporeal lineups. The trial court denied defendant's motion to suppress on this ground. The constitutional questions relevant to the suppression hearing are questions of law we review de novo. *People v Custer (On Remand)*, 248 Mich App 559, 558; 640 NW2d 576 (2001). We review for clear error the trial court's factual findings in a suppression hearing. *Id.* at 559.

-14-

The Sixth Amendment, U.S. Const, Am VI, right to counsel attaches "only to corporeal identifications conducted at or after the initiation of adversary judicial proceedings against the accused by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *Hickman*, *supra* at 605, 607-609.

In this case, defendant was arrested on December 2, 2004, in Battle Creek on an outstanding bench warrant. He was also placed under arrest for the armed robbery of Howard's party store. The next day, December 3, 2004, the live lineup was held for the witnesses from the pizza delivery robbery and the gas station robbery. The three robberies were later consolidated into one felony complaint, and defendant was arraigned on all of the charges that same afternoon, one day after his arrest. Only at this time did the adversarial proceedings commence. At the time of the challenged lineups, defendant was not entitled to counsel. *Hickman*, *supra*.

Defendant now asserts for the first time on appeal that there was an unnecessary delay between his arrest and his arraignment the following day. This issue is not preserved, and it has no merit. Defendant speculates that the only reason for the delay in arraignment was to create an opportunity to hold corporeal lineups without counsel present. MCR 6.104(A) provides that "unless released beforehand, an arrested person must be taken without unnecessary delay before a court for arraignment ..." The United States Supreme Court has held that any delay of more than forty-eight hours must be presumed unreasonable. *Riverside Co v McLaughlin*, 500 US 44; 111 S Ct 1661; 114 L Ed 2d 49 (1991). However, a shorter delay may also be unreasonable if it was unnecessary. *Id.*, 500 US at 56. Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake. *Id.* In evaluating whether a delay in a particular case is unreasonable, courts must allow a substantial degree of flexibility. *People v Manning*, 243 Mich App 615, 628; 624 NW2d 746 (2000).

Here, the arraignment was within 48 hours, so the delay will only be deemed unreasonable, if it is determined to be unnecessary. Defendant suggests that there was only a delay to allow for a corporeal lineup without counsel, but beyond this bare assertion, there are no facts in the record to support this proposition. Therefore, defendant has demonstrated a plain error requiring reversal.

(Op. at 3-4).

The Michigan Court of Appeals rejected petitioner's challenge to his sentence. (Op. at 4).

-15-

Petitioner sought review of the same issues in Michigan's highest court.  On May 30, 2007, the Michigan Supreme Court denied petitioner's application for discretionary review. (05/30/07 Order, found in Appendix B to Petitioner's Brief, docket # 2-4, ID# 54).

### D.    Habeas Corpus Petition

On August 22, 2008, petitioner filed his petition for federal habeas corpus relief. (docket # 1).  He filed his amended petition on September 29, 2008.  (docket # 6).

### <u>Standard of Review</u>

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001).  AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 130 S. Ct. 1855, 1862 (2010).  "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006).  If a state court adjudicated the claim, deferential AEDPA standards must be applied.  28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

-16-

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012)(*per curiam*). The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;[2] or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010).

---

[2] Under this standard, a lower court must ground its decision on the "holdings" as opposed to the "dicta," of Supreme Court decisions as of the time of the relevant state-court decision. *Howes v. Fields*, 132 S. Ct. 1181, 1187 (2012). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' 28 U.S.C. § 2254(d)(1). It therefore cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. at 2155.

## Discussion

### I.        Sixth Amendment Claims of Ineffective Assistance of Counsel

In ground I, petitioner claims ineffective assistance of counsel by: (1) failure to sever unrelated offenses, (2) failure to challenge unreliable and suggestive identifications, (3) failure to request a live lineup in the Howard's Party Store robbery, and (4) failure to introduce evidence that would have severely damaged the prosecutor's case.[3]   (Pet. Brief at 2-11, ID#s 19-28).   The Michigan Court of Appeals held that all petitioner's claims of ineffective assistance of counsel were meritless.  The strategy of electing to try all three cases in one trial was reasonable.  The challenged identifications were not unreliable.  The decision against requesting a lineup for the witnesses from Howard's Party Store robbery was reasonable.  Trial counsel was not deficient in his efforts to cast doubt on the testimony of petitioner's accomplices.  (Op. at 1-3).

Claims of ineffective assistance of counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome.  466 U.S. at 687-88.  In adjudicating the first prong of the standard, the court must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

---

[3]Petitioner's claims that his trial counsel was constitutionally ineffective for failure to object to the trial judge's estimate of the length of trial, for failure to object to the jury instruction on the charge of felon in possession of a firearm, and "cumulative error" are all considered in section III along with petitioner's other unexhausted claims.

Because the Michigan Court of Appeals found that petitioner's claims of ineffective assistance of counsel were meritless, its decision must be afforded deference under AEDPA. *See Harrington v. Richter*, 131 S. Ct. at 784; *Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012). To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698–99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586-87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see also Bourne*, 666 F.3d at 414. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id*. As for prejudice, the court focuses on whether "counsel's deficient performance renders the

result of the trial unreliable or the proceeding fundamentally unfair," *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993), and "[t]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Petitioner does not approach satisfying this demanding standard. The Michigan Court of Appeals applied the appropriate standard under *Strickland* and accurately analyzed each allegation of attorney error under that standard. The court's analysis of each claim focused on the dispositive issues -- whether counsel made a serious error and whether petitioner had shown a reasonable probability of a different result. The court appropriately found no breach of professional standards and, more saliently, no probability of a different outcome. The evidence provided by the eyewitness *and* petitioner's accomplices was overwhelming. I find that the state-court decision rejecting petitioner's claims of ineffective assistance of counsel was not "an unreasonable application of clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1).

## II.    Sixth Amendment Claim Based on the Lack of Counsel at Corporeal Lineup

In ground II, petitioner argues that he was denied his "State and Federal Constitutional Rights to the Assistance of Counsel" at the post-arrest corporeal lineup. (Pet. Brief at 15-22, ID#s 32-41). The purported violation of petitioner's rights under state law does not provide a basis for Federal habeas corpus relief. 28 U.S.C. § 2254(a). "Federal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The lineup at issue occurred before the initiation of adversary judicial criminal proceedings. The Supreme Court has held that the right to counsel at pretrial identification procedures applies only to corporeal lineups

-20-

after the initiation of adversary judicial criminal proceedings.  *Moore v. Illinois*, 434 U.S. 220 (1977).  The decision of the Michigan Court of Appeals finding no violation of petitioner's constitutional rights easily withstands scrutiny under AEDPA standards.

### III.    Unexhausted Claims

In ground III, petitioner argues that his Fourteenth Amendment right to due process and Sixth Amendment right to an impartial jury were violated by the judge's improper comments and prejudicial instructions to the jury.  (Pet. Brief at 23-26, ID#s 40-43).  In ground IV, he argues that he was denied his State and Federal Fourteenth Amendment rights to a fair trial due to the structural errors of the trial court proceedings which amounted to prejudice to petitioner.  Petitioner concedes that grounds III and IV "were not presented before the Michigan Courts."  (docket # 12, ID# 139).  This court has the statutory authority to deny unexhausted claims on their merits.  28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); *see Hanna v. Ishee*, 694 F.3d 596, 610 (6th Cir. 2012).  Petitioner's unexhausted claims are meritless.

### A.    Jury Selection

Petitioner argues that the trial judge's response to a prospective juror's question about the likely length of trial "clearly demonstrated that the judge had pre-judged the case as well as the verdict, where it was easily underlined to the jury deliberation won't take long."  (Pet. Brief at 23-24, ID#s 40-41).  This argument is frivolous.  Judge Schma's response contained no inference regarding petitioner's guilt or innocence.  The judge attempted to give a prospective juror a rough framework

for how long the trial would probably take, given the estimates provided by the attorneys, the number of witnesses, and the complexity of the case. Such estimates are commonplace and are designed to help protect a criminal defendant's rights by providing him with a jury of individuals capable of devoting their attention to the trial rather than being distracted or potentially called away to deal with other matters. *See United States v. Alanis*, 109 F.3d 1239, 1243 (7th Cir. 1997) ("[T]here is nothing unusual in a court's providing potential jurors an estimate of the trial's length."); *accord United States v. Ronne*, 23 F. App'x 565, 567-68 (7th Cir. 2001). Judge Schma made pellucid that the figure he provided was only an estimate: "[W]e don't put limits on how long juries deliberate. It can go for some time; it can be short. We don't know." (TT I, 48). Judge Schma's estimate of the length of trial did not deprive petitioner of a fair trial.

B.   Jury Instruction on Felon in Possession of a Firearm

Petitioner argues that a portion of the trial judge's jury instruction on possession of a firearm was prejudicial because it mentioned that his earlier felony conviction had been for "larceny in a building." (Pet. Brief at 25, ID# 42)(citing TT IV, 556). There is no general federal right to a properly instructed jury. With few exceptions, the substance of a jury instruction frames a matter of state law. *See Estelle v. McGuire*, 502 U.S. at 70-72. Consequently, a federal court may grant habeas relief based on errors in state jury instructions only in "extraordinary cases." *Daniels v. Lafler*, 501 F.3d 735, 741 (6th Cir. 2007) (citing *Lewis v. Jeffers*, 497 U.S. 762, 780 (1990)). A habeas court may not grant relief on the basis of an allegedly erroneous instruction on evidence merely because it disagrees with the instruction. The only question in habeas corpus is "whether the ailing instruction itself so infected the entire trial that the resulting conviction violates due process."

-22-

*Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)); *accord, Waddington v. Sarausad*, 555 U.S. 179, 191 (2009).

Petitioner has not satisfied this demanding standard. The instructions, as delivered, were the subject of careful consideration by the attorneys and the trial court judge. Judge Schma had conducted a jury instruction conference with prosecutor and defense counsel. The prosecutor and petitioner's attorney stated on the record that Judge Schma had accurately delivered to the jury the instructions that they had previously agreed upon. (TT IV, 566). The judge's instruction was accurate. Petitioner had a prior conviction for larceny in a building. The instruction was not prejudicial. It was necessary for the jury to know that petitioner had a previous felony conviction of some kind; this was a necessary element of the charge against him. MICH. COMP. LAWS § 750.224f. Petitioner might have an argument of prejudice if the prior conviction had been for armed robbery, but it was not -- it was for larceny from a building. *Cf Old Chief v. United States*, 519 U.S. 172, 174 (1997) (in federal prosecution for possession of firearm by a felon, court abuses its discretion in rejecting stipulation to prior conviction only when "the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations."); *see Bradley v. Birkett*, 192 F. App'x 468, 475 (6th Cir. 2006) (petitioner failed to show prejudice arising from counsel's failure to seek *Old Chief* stipulation). Here, petitioner could not have been prejudiced, as the nature of the previous conviction created no "improper consideration" that could have tainted the verdict.

C.    Cumulative Error

Petitioner argues that, even if the alleged independent errors do not warrant habeas relief, taken together, their cumulative effect warrants such relief. (Pet. Brief at 12-14, 27-29, ID#s

30-31, 44-46).   The Sixth Circuit has consistently held that cumulative error claims are not cognizable on habeas review.  "The Supreme Court has not held that constitutional claims that would not individually support habeas relief may be cumulated in order to support relief."  *Scott v. Elo*, 302 F.3d 598, 607 (6th Cir. 2002); *see also Moreland v. Bradshaw*, No. 09-3528, __ F.3d __, 2012 WL 5518930, at * 18 (6th Cir. Nov. 15, 2012); *Sheppard v. Bagley*, 657 F.3d 338, 348 (6th Cir. 2011) ("Post AEDPA," a claim of cumulative error "is not cognizable.").  Moreover, because the individual claims are without merit, petitioner cannot show that any cumulative error violated his constitutional rights.  *See Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000).

       D.     <u>Ineffective Assistance of Counsel</u>

       The Amended Petition includes three unexhausted claims of ineffective assistance of counsel based on the jury selection, jury instruction, and cumulative error claims addressed above. (Amended Petition, docket # 6 at ID#s 114, 118; *see* Pet. Brief at 11-14, ID#s 28-31).  Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel.  *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007).  Because the underlying claims lack merit, counsel's failure to object was neither erroneous nor prejudicial.

**<u>Recommended Disposition</u>**

       For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:  December 4, 2012        /s/  Joseph G. Scoville
                                  United States Magistrate Judge

-24-

## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).